Deborah Heart&Lung Center v. Virtua Let me try a more specific question. Emergency procedures, the market involves Burlington, Monmouth, and Ocean counties. There's three counties, right? That's the market that you presented to the district court. Yes. Three counties. In that area involving those procedures, what was the percentage of cases that were directed to emergency procedures on the part of Virtua? We don't have the specifics of what percentage of patients. How do we know what share of the market? I can explain that, Your Honor. Don't we have the statistics that the parties have agreed upon through the expert? That is that for emergency PCI services in three New Jersey counties, Deborah's share was 9 percent. CGPA's share was 7.3. For non-emergency ACI, Deborah's was in the five New Jersey counties. It was 10 percent for Deborah and 4.3 percent. And so what we're really talking about here is only 20 percent of Deborah's, 9 percent of the market, essentially 2 percent of the patients in the overall market. That's right. I thought you had those figures in your head. I did. But I think the point is it's really a small percentage. With those numbers, how do you destroy consumer choice? The focus should not be on the size of the market. That's an error. The focus should be on the specifics of how this market operates. The Toys R Us case, which we've referred to, specifically is an authority that says you can't just look at the size of the market. You have to look at the specifics of this market. You have to do one or the other. We're either going to look at the actual effects, which is the theory that you seem to have exclusively pursued before the district court, or you're looking at this market share and the new sort of sub-market theory that it seems you're presenting for the first time on appeal. Even if we go with that sub-market theory, we're looking in the context of the market as a whole when it comes to substantial foreclosure. But the market as a whole doesn't mean the percentage of the market. The market as a whole means, as you have to say, was the process, competitive process, affected, and were consumers affected? But doesn't that prove too much? Because Devorah is clearly not happy that it no longer has the arrangement that it used to have with Virtua. So now there's a similar type of arrangement with Virtua and Penn Presby. But if the issue when it comes to the anti-competitive effect with the sub-market is taking away patient choice, if that's what you're going to hang your hat on, doesn't that suggest that the arrangement that you originally had suffered from those same defects? No, because we didn't have that arrangement. There was no exclusive arrangement ever between Devorah and CGPA or Virtua. There was an 85% referral rate, right? Based upon a healthy market. And what the evidence below showed was that Devorah was competing. What the evidence below showed is that before you had the concoction of the so-called white knight strategy and before you had a process of denying patients their requests to go to Devorah, not advising patients about the other available facilities. That may give rise to other causes of action, and certainly that raises some very serious concerns, those allegations. But we have to deal with an antitrust alleged violation here. And what I'm describing to your honors is direct evidence of an impact on output. Patient choice was clearly affected. There's direct evidence of it. There are patients who have testified. Well, it's anecdotal evidence, really. Well, it's patients who both complained during the relevant time period and patients who underwent examination under oath and testified in detail about their experiences. We have testimony from the physicians about what their practices were, where ethicists have said this practice was improper, patients were deprived of choice. We know that patients did not get the option to go to Devorah, which has the highest patient satisfaction scores, period. But the notion that this is simply a case where one exclusive dealing arrangement has been interchanged or replaced with another just isn't so. Well, there was an agreement between Devorah and C.G., the cardiac group, right? There was no agreement. What was happening is, as a matter of competition, the cardiac practice was referring patients to Devorah. Devorah would try to get more patients. There's evidence on the record of meetings where, when Devorah was actively competing with Penn Presbyterian, Devorah said, look, we see that you're sending certain cases to Penn Presbyterian. You don't say that they're entitled to refer their patients to whoever they want to refer patients to? Maybe they happen to think that treatment in a certain hospital is very good. Well, if they're operating in the best interest of the patient and they're using their good faith professional judgment, sure. Why isn't that the case here? Because we have direct evidence in black and white that there was a plan to shut down Devorah by redirecting patients away from Devorah. We have e-mails that say that Devorah is the only choice that provides timely service. We have documents and testimony. A plan to shut down Devorah in order to what? Well, the plan was, and this isn't argument, this is documents on the record. This is not part of this case? It is part of the case. But the point is that the plan was to redirect patients away from Devorah, to weaken Devorah, to cause Devorah to shut down, so that Virtua could then apply to the Department of Health in New Jersey and seek the issuance of a certificate of need for the very cardiac surgery service it could not provide. That's a fact of record in this case. But even accepting that evidence in e-mails and the like, we need to look for the market effect. We need to look for substantial foreclosure, some sufficient control of the marketplace for that even to be a real possibility. And with the statistics that were put before the district court here, how could we possibly conclude that the district court erred in its determination? Can I answer? I see my light's red, but the answer to the question is this. It's undisputed that there are patients who live or have situations within the vicinity of the Virtua Memorial Emergency Department where if those patients have a problem, all of those patients, all of them, are sent to the Virtua Emergency Department. Once they got there, every single one of those patients, 3,000 of them, were denied choice. The argument that Virtua is making, and I think that the court is a dangerous one, is that we haven't hurt enough patients. We haven't exercised enough control over patients. Well, it's not the patients who are being hurt. I mean, this isn't a medical malpractice case. It's Deborah that's being hurt. Deborah is being hurt, but this isn't the case of a disgruntled competitor. You know, there is, as I pointed out, direct evidence where patients specifically chose and wanted to go to Deborah, but they were denied that right. Okay, but there's no evidence that the patients were hurt. Well, there's evidence that, for example, patients didn't want their family members, didn't want patients to go to Penn Presbyterian and family members died. Some did go to Deborah, didn't they? There were leakages. There wasn't a complete freeze of referrals to Deborah. The differential between pre-conspiracy and post-conspiracy was 85 percent to Deborah and then a drop from between 15 to 30 percent, which were made up, for example, of uninsured patients and patients where Penn didn't cover their insurance. You know, I noticed a change in the landscape recently because it seems like doctors are aligning themselves into medical groups and organizations where they work within the group. So if you're a patient of one doctor, there will be a referral to another doctor or a medical facility within that same group. Based on your theory now, all of these organizations, there's one in North Jersey called the Summit Medical Group, are now in violation of antitrust laws. No, not at all. The situation I think Your Honor is describing and the way that I would distinguish this case would be through an explanation of the lock-in. When you select, for example, your doctor, if you have medical insurance, when you select your doctor, you make sure that your doctor is covered by your policy and you pick your doctor and there you go. In this instance, patients have an emergency. They're taken to a hospital. They're supposed to have a say in where they go next when they get to Virtua because Virtua can't perform the surgery. Virtua can't perform the intervention. Those patients have a right to say, I want to go, for example, to Debora because Debora doesn't charge co-pays. These are emergency patients, you say? The vast majority are emergency patients. But even the non-emergency patients. The idea of the non-emergency patients is to send them to probably the closest hospital available. Which should have been Debora and it wasn't. The situation that Your Honor is describing is in the outpatient setting. When a patient sees a cardiologist, by the time that patient has an emergency or requires treatment, by the time they reach that point and they find out that it's CGPA's policy, the Virtua physician's policy, not to honor that choice. We say it's too late. Your example of the Summit Medical Group, which I'm very familiar with, is phenomenal because you know that when you go to Summit that this physician, through clinical integration, is going to be best positioned to provide you care. If you need multidisciplinary care, you're going to go to his partner and they're going to talk. You've chosen that for these patients. And it's not, you know, this is direct patient testimony. This isn't an expert report saying this is how it could work or how it may work. This is actual patient testimony. But aren't we back to the fact that the deprivation of patient choice may give rise to certain causes of action under New Jersey law or other claims that you might bring. But for antitrust standing and the antitrust actual market effect that you need to show, you've acknowledged that it went from 85 percent to 30 percent. That's not even an exclusive dealing arrangement. That's only partial exclusivity that the Supreme Court has said will almost never give rise to actual market injury. I depart from a position that the loss of choice is not indicative of a reduction in output. The loss of patient choice is an anti-competitive effect, as is the loss of quality in the market. We've established that, too, because as a matter of published governmental HCAHPS data, Deborah had provided higher quality during the time period. That's another element of lost output. There's a third element, increased price. We have patients who said they wanted to go to Deborah, ended up going to Penn. They walked out with bills of $180,000 to $200,000. We're not standing in the shoes of the patient saying we have a cause of action because patients were deprived rights. We're saying that the loss of patient choice plus the loss of quality plus increased price for insurance carriers aren't going to pick up the cost of an ambulance to go from Mount Holly to Philadelphia when you have a heart hospital 12 miles away. These are all indicia of an unhealthy competitive environment and indicia of an anti-competitive effect. But those effects, even accepting them as true as to this small subset of patients, those types of effects, the actual market effect, which was the theory you were pursuing before the district court, didn't you have the burden to show that in the marketplace as a whole, not with respect to only this sub-market, which is the theory that you now seem to be pursuing? Well, the distinction is this. From our view, and we think this is consistent with the Supreme Court, it's consistent with the law of the circuit, market as a whole refers to injuries to consumers and injuries to the competitive process. The market share analysis, which is I think what we're talking about right now, is part of a market power analysis when you don't have direct evidence. What we're saying is, and it's consistent with all of the evidence below, is that yes, Deborah competes generally within this larger market, but it's a quirk of this market where you can't say it's incorrect to rely upon Virtua's market definition because it fails to account for a couple of things. For example, number one, not all cardiologists have the ability to send patients out, nor should they send patients out of emergency departments where when a patient comes in, the patient will stay. They shouldn't be included. Deborah can't, for example, compete for patients who show up at Lourdes in emergencies or show up at Cooper for emergencies because once those patients get there, they're going to be treated. Really, while Deborah competes generally in the market, the market that we're really talking about and should be talking about is the market that concerns patients within the Virtua emergency department. And we're not changing the market definition. It's a quirk of how this market works. Maybe you can see I'm just thinking of something else, but it was out of medicine. It has to do with law firms. I'll say there's a personal injury law firm. They handle tons of cases in South Jersey. One kind of case they won't do is medical malpractice, and all the medical malpractice cases go to this one particular firm in South Jersey, which accounts for, let's say, 30 percent of all the malpractice cases handled in South Jersey. Is that an anti-competitive referral? I would say no, not necessarily, but it depends upon the motives and the facts, and our facts here are very different. I'll use Your Honor's hypothetical. If I have the power and if I have control because of the other cases, If this were a few months ago and I was still at Silscommis, I would say that if I have the power because I'm the only law firm where clients can come for particular work, and I effectively have a monopoly over those customers, right, because just like Virtua effectively has a mini-monopoly over the patients in their region. And I say, I'm going to take these patients, or these clients, and I'm going to send them to this other law firm, which isn't as good, because I want to knock this competitor out of the picture. I want to wipe them out. Well, that's sort of a monopoly. I just happen to think it's a very, very good law firm, and that's where I'm going to send all my cases. Now the client may say, I really don't want to go there, I'll handle it. But this is my referral. The difference is, remember that in medicine in New Jersey, there's a patient bill of rights that requires that patients have the right to choose. In New Jersey, there are codes of medical ethics that require informed consent and require you to give alternatives. And there's a legion of facts that indicate that the purpose here, and the intent wasn't to send someone away for higher quality of care. The legion of facts indicates that the reason was purely anti-competitive, to wipe out a competitor, to be positioned to take the certificate of need for cardiac surgery from that competitor. Maybe you can finish your response. I didn't mean to take up so much of the time. Mr. Leibovitz? Yes, Your Honor. If you need extra time, we'll have to add it since your colleague took up a little extra time as well. Good morning. I'm Philip Leibovitz from the Duane Morris Law Firm, and I represent all of the defendant appellees who are Virtua Health, Inc., Virtua Memorial Hospital, Burlington County, and the cardiology group, which is sometimes referred to as CGPA. This is a much more straightforward issue than the prior discussion really revealed or addressed, because what you were hearing is an attempt by Deborah to change the market definition that was relied upon below. And the reason for that is because the market definition below, which started with Deborah's actual first amended complaint, which was ruled upon in 2011 when Judge Baum ruled on the motion to dismiss based on the allegations of a multi-county relevant market, which Deborah then retained an expert who refined that market and defined it as multi-county markets, which the defendants then accepted for the purpose of this summary judgment motion, and which Judge Baum meticulously requested that each side agree at the beginning of oral argument that there was no dispute regarding the relevant market. Judge Baum then determined that there was no dispute of material fact that Deborah had not offered any evidence of an injury to competition in the relevant market, except for injury to itself, which was insufficient based on the market definition provided by its own expert and agreed to in oral argument. But they point to the line in Appleby's expert report about the lack of patient choice and that putting before the district court evidence of a sub-market or a basis to think about the sub-market. I disagree, Your Honor. What the expert report was doing was explaining the operation of the market, but it did nothing to establish or define or put before the court a definition of a sub-market. In order to change the market at this juncture would be extreme prejudice to defendants because this is not a motion to dismiss case. This is a case where there was extensive discovery starting with the First Amendment complaint, as I said, and also a denial of our motion to dismiss based on a multi-county market definition that was premised on there being a multi-county market definition and to suggest at this juncture on appeal for the first time that the court could evaluate competitive effects based on the effect on Deborah or on, which is even more extraordinary, the concept that Memorial has a monopoly on emergency room patients would be totally incorrect and prejudicial. On that point, what Deborah is essentially saying is that any business has a monopoly in its own customers, which is an absurdity for the antitrust laws. Aren't they really pointing out some things that are unique to this market? But let's just assume that we think there was sufficient evidence or argument of this to be fairly before the district court and that we're prepared to entertain the theory. Then doesn't Eastman Kodak say we need to look at the actual operation of the market? And there is evidence that appears in the district court record that emergency room patients are effectively locked into certain policies. They're not able to make choices about where they go, that there is that kind of control of the market as in Eastman Kodak. Well, Your Honor, first of all, there is no evidence in the record and no one has ever attempted to define a market regarding emergency rooms. That's nowhere here. So there's no predicate on which to determine even what the emergency room market is, much less whether anyone has any market power in that market or whether there's been any kind of effect of this restraint on a market of patients going to emergency rooms. In Kodak, there was a market definition that Kodak had market power in the market for Kodak parts and that Kodak was using that market power to extend into the tied market of service for Kodak machines. Wasn't the market defined here as a referral of emergency procedures, ACI procedures within a geographic area? The market was defined as the hospitals that compete for ACI procedures. What Debora's expert did was to look at the hospitals that were in the market of receiving those patients and competing for those patients. There was no dispute about that being the market for emergency procedures? There were two markets defined. What Debora's expert said was that the eight hospitals in the three-county market for emergency procedures competed for patients who needed those emergency procedures, that the ten hospitals, at least, who were in the market for the non-emergency procedures competed for the patients who needed those procedures. Any analysis of whether the referral arrangement between the cardiology group and the Penn doctors affected competition has to be viewed in terms of the markets that were defined in terms of whether that arrangement lessened competition among the hospitals that were competing for those patients. Let's focus on the emergency PCI services and the issue of patient choice there. When you were opposing Debora's argument that patient choice was adversely affected, you've pointed us to Jefferson Parish. But there, in the anesthesiologist arrangement, there was advance notice to patients about what the nature of the referral would be. There was awareness, effectively, of being locked in. There does not appear to be evidence of that here. Doesn't that materially distinguish Jefferson Parish? No. Well, first of all, I don't believe there's anything in the Jefferson Parish record that says that patients were on notice. If you were to go to Jefferson Parish Hospital in need of surgery, you may have met, potentially, your anesthesiologist. But I don't recall anything in Jefferson Parish about patients being on notice that they were only going to get that one set of anesthesiologists. What the court says is if any patient really cared, they could have found out who the anesthesiologists were going to be and go somewhere else. But that's a different matter. Isn't the record here exactly 180, that patients, even when they've made a choice, they've made a request or it's being denied? Well, the anecdotal evidence, as Judge Roth pointed out, of 20 patients, is not sufficient in an antitrust case. There is, as Your Honor, Judge Krauss pointed out, we're talking about 2% of the relevant market here at the most. And within that, there's a very small number of people who have this anecdotal evidence. But once again, I'd like to switch to one other thing on this point, which is that the law in this circuit prohibits a market based solely on one entity's customers or business. In the Orson v. Miramax case, Orson complained, we were deprived of the films from Miramax. And the court said, this court said, no, there's 59 other distributors. In the brokerage concepts case, which was presented to the district court, it's not in our appellate brief, but it was presented to the district court, it's a very, very close case here on the subject of whether a particular entity's customers can be a market. And what happened in that case, to greatly simplify, Judge Becker did an incredible job of laying out the complex facts. But the essential thing there was that it was alleged that U.S. healthcare and HMO was using its power over the members of its HMO to restrict which companies could provide prescription benefits for those patients. In other words, they were saying, if you don't do what we say, we're not going to put you on our list of preferred network providers, and therefore none of our U.S. healthcare patients will be able to go to you unless they pay the full amount, because we won't pay. And what this court said was that U.S. healthcare's patients cannot be a relevant market. That the market was all patients of health plans. And the fact that U.S. healthcare may have had market power over its own patients did not give it market power over the patients in the relevant market. The same thing is true here, and to get back to your question, Judge Krause, the denial of patient choice that is in those 20 examples is not a denial of choice that's caused by a lessening of competition in a relevant market. And that's the antitrust criteria. It's not whether patient choice is lessened. Patient choice can be lessened by 100 different things, as Judge Fuentes was pointing out with his law firm example. For example, if the cardiology group doctor said to patients, don't go to Debora, it burned down last night, that would be a way to limit patient's choice. But it would not be an antitrust violation. It might be something else, but it's not an antitrust violation. To limit patient choice as an indicator of direct evidence of adverse impact on competition, the patient choice has to be restricted by a restraint on competition. And here, a restraint on competition would mean, as defined by Debora's expert, a restraint on the 8 or 10 hospitals that compete for those patients. A typical antitrust restraint on patient choice would be if 6 or 7 out of the 8 hospitals got together and said, we're not going to take patients from the cardiology group. That's an antitrust restraint on patient choice. Or, although the market was never defined here, if one looked at the market of cardiologists, which we demonstrated the cardiology group's 12 physicians only constituted less than 8% of the market of cardiologists. If all of the cardiologists got together in the market and said, we're not going to send patients somewhere, that could potentially be an antitrust complaint or indication of patient choice affected by a lessening of competition. But there's no lessening of competition here because we're only talking about individual effect on Debora and patients of an individual group. And that's why the market definition is so critical in both the Supreme Court jurisprudence and in this circuit. Have we really gone, going back to your earlier point, have we gone as far as saying that as a matter of law, a sub-market like this cannot be the basis for anti-competitive effect? You put it to Orson, but there we were rejecting the attempt to avoid access to proof on actual market effect through a theory that was raised of a sub-market because there wasn't sufficient evidence that had been presented of that sub-market. We didn't reject as a matter of law that that sub-market could be the basis for a viable antitrust theory. That's why, well, first of all, in turn, and Orson, did you just say Orson? Orson. In Orson, I think that was more on the subject of whether there was an effect on competition rather than whether there was a market defined as that. But it's the same point really, which is that Miramax as a distributor was not sufficient to be a market. The point about as a matter of law, in the brokerage concepts case, and this is at page 512 of F3rd, this is what Judge Becker said in this opinion. The plaintiff has posited a single brand market consisting solely of U.S. healthcare members with prescription drug benefits. Should we accept this market definition, our inquiry would be at an end for U.S. healthcare must, by definition, control 100% of this product market, its own patients, regardless of the geographic market. And then it says that the plaintiff attempted to support the product by arguing that no other products were reasonably interchangeable with U.S. healthcare members. And the court says examining these contentions, we conclude that this narrow market definition cannot stand as a matter of law. And I think the point is, if there's going to be a contention that patients who were at virtual memorial in need of a transfer constitute a separate sub-market, there has to be an economic analysis that those patients are somehow different  and the other patients in the market were available to Deborah to compete for. Does Deborah handle a substantial number of CPI pulmonary interventions in that market area? I'm sorry, I missed the question. Does it handle a substantial number or percentage? Does Deborah handle a substantial number? Yes. No, what we have, what we've demonstrated, and there's actually a chart in the record, which I believe is at A806, which demonstrates how we get to the number. And Deborah, based on Deborah's documents, the cardiology group patients, they are, by the way, one of the few hospitals that handles this type of procedure. Isn't that correct? Well, no. I'm speaking from my memory of having read in the record that they are one of the very few hospitals that can handle certain types of procedure. So the markets that I've been, the number of hospitals I've been describing in the defined markets, the eight in the emergency market, ten in the non-emergency market, those are all hospitals that are able to compete for those specific procedures. So in the market that they're expert defined, they're one of eight or one of ten that can provide those procedures. In terms of all of those procedures and the market as a whole, Deborah constitutes approximately ten percent overall, counting all patients of the number of those types of procedures that are done in those markets. And we're talking here, as Judge Krauss pointed out before, we're talking here about less than 20 percent of Deborah's ten percent of the market. So at issue in this case is only two percent of the relevant market. Although they dispute that. That's an appropriate calculation, right? Well, it's based on their documents. It was computed and presented by the expert report of our expert. And there's nothing in the record that I'm aware of that contradicts that. But there was... I'm sorry. Does Deborah have an emergency room? Well, that's exactly where I was going to go. Thank you, Judge Roth. So one other point here that's of interest or that's relevant is whether Deborah could compete. As I said, there were these, you know, 92 percent of the cardiologists who were able to transfer these patients were available to Deborah to compete for them. Is there evidence in the record that they could and did compete for them? The answer is yes. On the first point regarding the emergency room and the so-called lock-in concept, the reason Deborah did not have an emergency room in the past was because Deborah is a specialty hospital, heart and lung. Therefore, it did not have an emergency room because if you were someone who had appendicitis, you wouldn't want to be brought by an ambulance to a heart and lung hospital because they couldn't deal with your appendicitis. What Deborah did in 2000, beginning of 2010, to address this issue was they made an agreement with Lourdes Medical Center of Burlington County for Lourdes to put a satellite emergency department on the Deborah campus. And what that did was that when ambulances picked up someone who lived near Deborah, they were able to bring them to that satellite emergency department on the Deborah campus and not to Virtual Memorial. The antitrust significance of that is Deborah was able to compete for emergency room patients by doing that, and nothing changed between 2007 and 2010 to allow them to do that. So, in fact, what this case is really about is not about preserving competition, which is what it's meant to be about. Deborah's claim here is to be protected from competition. Because the competition that the competitive things that they could have done, such as opening their own emergency room, establishing other relationships with other referring physicians, the record shows that they did do those, and they were able to compete for 92% of the market. Mr. Leibowitz, thank you very much. Mr. Argyropoulos? I believe we're going to have to hold you to the two minutes this time. Pardon me, Your Honor? You reserve two minutes? Two minutes, yes. Can you focus for us on which theory we even can be addressing? Why isn't the sub-market theory waived when it doesn't appear to have been presented at all to the district court? The Kodak case makes it clear that when you are analyzing a market, you have to look at how that market operates. Whether you call it a sub-market or whether you call it a quirk of how the market works, those facts were before the court. We proceeded and we articulated our claim saying that we have direct evidence and all we need to show is rough contours of the market. The court saw the direct evidence. The lower court referred to direct evidence. What the court was presented with was a market power analysis and economics that basically said, look, I know it looks like patients lost choice. I know it looks like every other hospital could not compete for patients out of Virtua's emergency department. But look, we have an expert report that says that evidence really can't exist because economically it can't. But it did exist. But where are you presenting market power theory to the district court? How can we fault the district court for the ruling made when it appears that you made a strategic choice to proceed with the actual market effects and that's what the district court then addressed? Because the district court adopted a market power analysis. A market power analysis is supposed to be a surrogate for direct effects. Defendants moved on summary judgment and said that DeBoer loses because it can't establish market power. DeBoer countered and said, no, in this circuit we don't need to show market power because we have direct evidence of anti-competitive effects. Defendants argued, yeah, but there's still no market power. And so when the court adopted an economic market power analysis, what should have happened at the time and which is part of the record at the time, is under Kodak you have to look to see how does this actual market operate. And the way that this actual market actually operates is that CGPA, the cardiology practice at Virtua, and to be clear, it wasn't just the cardiology practice. It's the Virtua emergency department physicians were instructed to send patients directly to Penn. Nurses were. But the way that this market worked was they were the Kodak of cardiology. When you got there, you were locked in. At that point, you're being sent to Penn Presbyterian. Those facts were in the record. Those facts were part of the expert economist's report. This argument was addressed. It was set up as an argument and rebutted in Virtua's own paper. So I appreciate, I really do appreciate in every way that the way that the facts are being packaged is we're saying, look at it now from a market power analysis the way that the court should have looked at it. And the court simply did not appreciate the facts that we're laying out to this court now. Could we have articulated it better? Yes. We have another case that's going to take a lot of time, so would you finish? That's all I have. Unless there are any other questions, I'm finished. Thank you. Appreciate it. Thank you both very much for your arguments. We'll take the case under advisement.